## HAY v. NANCE.
### No. A–8177.

District Court, Alaska
Third Division, Anchorage.
March 31, 1954.

Harold J. Butcher, Anchorage, Alaska, for plaintiff.

Evander C. Smith, Anchorage, Alaska, for defendant.

McCARREY, District Judge.

This is an action in damages wherein the plaintiff seeks to recover from the defendant $45,000 for compensatory damages, of which $10,000 is asked for pain and suffering, plus costs for injuries she sustained on or about the 21st day of July, 1952, while riding as an invited guest, with the defendant, his wife, and two other guests, in a 1950 4-door Pontiac sedan, owned and driven by the defendant.

## Facts.

The parties and witnesses of both the plaintiff and defendant appeared forth-right. Naturally, there were substantial differences of opinion, some of which proved irrelevant to the genuine issues of this case; i. e., the number of drinks of gin the plaintiff had before leaving the defendant Nance's residence, if any; the last one to close the back door on the right hand side; the degree of darkness at the time of the accident; however, the testimony as to the speed of the vehicle immediately before the accident, and as to the place the defendant passed a car going in the same direction just prior to the accident, was highly controverted and strikes at the very heart of the real issue in this case—proximate cause, contributory negligence, etc., and on this point, the parties find themselves in completely opposite corners of the ring of evidence.

These general facts, immediately prior to the accident, are admitted without dispute:

(a) That the plaintiff and husband, defendant and wife, and one Mrs. Vena McCarthy, met perchance at Club "515" during the afternoon of July 21, 1952, after which they jointly engaged in conversation and drank beer in a spirit of conviviality, and then, toward dinner time, they all rode with the defendant, in his car, to the home of the defendant and his wife, in the City of Anchorage.

(b) Following a dinner, which had been served by the defendant and his wife, it was more or less mutually decided that they would all go to the "Fireside Lounge" night club, located in Spenard (which is a small, unincorporated business district located as a suburb to the City of Anchorage), to dance and have a beer or two. Before going to the "Fireside Lounge", the small daughter of Mrs. McCarthy had to be taken to a baby sitter, who lived in a trailer court beyond the Spenard business district (and which was in the vicinity where the accident later occurred). The five adults, together with the minor child of Mrs. McCarthy, left the home of the defendant about 9:15 p. m. in the car of the defendant, and with the defendant at the wheel, they all rode through, and beyond, the Spenard business district to the trailer court, where the daughter was left, thereafter retracing their path back to the "Fireside Lounge" night club, arriving there about 9:30 p. m. (See Defendant's Exhibit A).

(c) Beer was ordered for the party and several of them danced a time or two. After some two hours of fun and festivity, had gone by, at about 11:00 to 11:30 p. m., it was decided that they would leave, pick up the daughter of Mrs. McCarthy and call it a day.

(d) The conduct and driving of the defendant during that day and evening was very good and nothing out of the ordinary. The plaintiff's husband had been riding to work with him to the Civil Aeronautics Administration Office at Merrill Field, where they were both employed, for quite a period of time. The defendant's driving had always been exemplary during this time..

(e) While it was not dark at 11:00 to 11:30 p. m. on the 21st of July, due to the long days and midnight sun that prevails here in the Territory of Alaska, some of the cars on the highway used by the defendant at that hour, had their lights on.

(f) None of the occupants of the car at the time they left the "Fireside Lounge", nor the driver, appeared to be under the influence of liquor, from there to the place of the accident.

(g) Neither the course the car took, nor the manner and speed the car was driven, up to the time immediately prior to the passing of the car before the accident, indicated anything abnormal or out of the ordinary.

(h) The defendant and Mr. Hay were riding in the front seat of the defendant's car, with the defendant driving. The three women were in the back seat, with the plaintiff sitting in the middle between Mrs. McCarthy and Mrs. Nance. The car in which the parties were riding

appeared to be operating and functioning in a normal manner.

(i) The roads were in good condition and visibility was normal.

After passing a car going in the same direction as that of the defendant, regardless of the particular place this car was passed, it stands undisputed that the car of the defendant, with the plaintiff and defendant, etc. went off the highway on to the gravel shoulder, while at the same time, the right back door of the car struck a post, thereby forcing it open and while the car careened back and forth for a distance of some 120 yards, after striking the post (See Plaintiff's Exhibit 8), the lurching and/or centrifugal force was so great that all three passengers in the back seat were spewed out through the open right back door of the car on to the shoulder of the road, except the plaintiff, who was thrown clear across the road shoulder and barrow pit, coming to an abrupt halt under a trailer parked on private property in a trailer court, contiguous to the highway.

Injuries sustained by plaintiff:

As a result of being thrown to the ground from the car, the plaintiff sustained a fracture to her right femur and a fracture of the upper end of the right tibia into the knee joint, with a laceration below the knee.

The records of the Providence Hospital, together with the testimony of Dr. George E. Hale, as evidenced by his letter of November 19, 1953, and which is marked Plaintiff's Exhibit No. 6, which is but a resume of his oral testimony, shows the following:

"She was admitted to Providence Hospital on July 21, 1952, with a fracture of the right femur and a fracture of the upper end of the right tibia into the knee joint, with a laceration below the knee. The laceration below the knee was sutured and a Steinmann pin was put through the tibia, and the patient was placed in balanced traction and satisfactory reduction of the femoral fracture was obtained. However, it was necessary to place considerable pressure behind her lower thigh to prevent posterior angulation of the lower femur, and this was resulting in the development of a thrombophlebitis in the leg. So on August 2, 1952, an intramedullary nailing of the right femur was done. Healing occurred uneventfully. The patient was allowed to resume walking in six months, and bone formation has been progressively stronger every examination since that time, although most of the new bone formed has been medial to the nail. On examination today (November 19, 1953), the patient walks with a slight limp; she is a well developed and well nourished woman, in no apparent distress. There is a well healed scar, approximately 4″ long, over the lateral aspect of the right gluteal region, and a well healed scar, 5″ in length, over the lateral aspect of the right thigh. There is also a well healed semi-lunar scar, 2″ in length, below the right knee. The right thigh measured 47½CM, left thigh 51CM, 20CM above the upper margin of the patella. Right calf and left calf both measure 33½CM. Motions of both hips are normal; both knees hyperextend approximately 5 degrees beyond the 180 degree full extension; the right knee flexes to 60 degrees, * * *, and the left knee flexes to 25 degrees. Slight crepitus is palpable in the right knee joint on motion of the knee; the intrinsic ligaments of the knee joint are intact. Xrays taken of the right femur reveal that an intramedullary nail is in the medullary canal; there is a large amount of dense bone formation medial to the nail at the fracture site.

"In summary, this woman has recovered to a great extent from the previously mentioned automobile accident. However, at present, I would estimate that she has a 15 to 20% disability of her right leg as compared to amputation above the knee. However, function should continue to improve gradually for over a period of several months. It is possible that in another year or so, it might be advisable to remove the intramedullary nail, but at the present, this is not indicated in my opinion." (See Plaintiff's Exhibit No. 6)

The plaintiff was employed as a stenographer-secretary in a real estate office and was paid the sum of $300 per month at the time of the accident. The evidence further showed that the plaintiff was admitted to the Providence Hospital July 21, 1952, was placed in traction August 2, 1952, for ten days preparatory to an operation and suffered great pain during this time. She was ultimately discharged from the hospital September 4, 1952.

After returning home, it was necessary for her to use crutches in the house until January 30, 1953, and it was a month thereafter before she could walk outside without them.

The plaintiff tried to go back to work in June but after three days and a half, she was forced to quit because her right leg became so swollen and turned blue. She was not able to return to work until about September 1, 1953.

The plaintiff still complains of a "cracking sensation" in her right leg at the knee which Dr. Hale describes as "crepitus" caused by the membrane having irregularities as a result of the accident. Dr. Hale testified that there was a synoval fringe which had developed on the plaintiff's knee; however, this was not uncommon, and while such a condition could be a forerunner of arthritis, chances were fifty-fifty that it would not develop into arthritis.

After both counsel had finished with the doctor, the Court asked the following questions and received the following answers:

"The Court: The Court has one question, Doctor. You state that the removal of this nail should be effected between six months and a year. What is the cost of that, Doctor, for such an operation?

"Dr. Hale: It depends, of course, very widely with the doctor who did it, but I would estimate it would cost from $50.00 to $100.00 for the surgeon's fee, plus hospital bill, and it should not require any long period of hospitalization. It is a relatively simple procedure.

"The Court: In that respect, do you care to give a prognosis of how long one would be in the hospital?

"Dr. Hale: Probably two or three days.

"The Court: Is this commonly done?

"Dr. Hale: It is done frequently, yes, sir.

"The Court: Do you anticipate any serious consequences of such an operation?

"Dr. Hale: No, sir."

Major Issue.

The real, crucial and focal fact determination of the entire case is to establish the place where the defendant passed a car going in the same direction, immediately prior to the accident. After this fact is determined, the proximate cause of the accident and the question of contributory negligence are then resolved. All legal obligations, implications and responsibility flow naturally from this fact, and the acts of the defendant leading up to, and during this time, taken together, establish such liability.

The plaintiff and her husband testified that they passed a car after the defendant had accelerated the vehicle between 40 and 60 miles an hour immediately after they crossed the railroad tracks. This was done in face of an approaching car coming in the opposite direction from the International Airport, toward Anchorage, as it rounded the curve, and, in their opinion, the cause of the accident was due to the careless, negligent and reckless manner in which the defendant drove his car around this automobile (going in the same direction), at the same time, seeing the lights of an oncoming car within a dangerous distance, making it impossible for the defendant to avoid hitting the oncoming car, in light of the speed and the curvature of the road.

In direct contradiction thereof, the defendant, his wife, Margaret McGee Nance, and Vena McCarthy (although the latter was not certain) all testified

that the defendant had passed the car going in the same direction (as the defendant) on the east side, and prior to, the time that they crossed the Alaska Railroad. The defendant testified that the passing had been completed and that he, in fact, came somewhat to a stop in order to cross the railroad tracks prior to passing the oncoming car from the opposite direction. On this one point, it is difficult for the Court to understand how five adult, apparently normal and average individuals, could possibly place themselves in such a divergent position.

As usual, the Court is placed in an unenviable position of fact determination in light of his testimony, and, therefore, must reason with physical, uncontroverted facts testified to by several witnesses, which stand unrefuted in the records of the case. Typical of such testimony is Plaintiff's Exhibit No. 9, which is the map prepared by Robert Sadilek, an engineer of the Alaska Road Commission, who places the distance from the railroad crossing to the crest of the curve as 393 feet; the post which was struck by the defendant's car, which apparently was the proximate cause of forcing the door open, thereby making it possible for the three occupants in the back seat, to be thrown from the car; the Y in the Spenard Highway with the McRae Road leg lying to the right and almost in the middle of the crest of the curve, the apparent path of the car after striking the post, etc.

### Argument.

Over objection of counsel for the defendant, the traffic accident report submitted by Officer Boyd and marked Plaintiff's Exhibit No. 8, was admitted in evidence. Attorney for the defendant strongly argued this exhibit should not be admitted for the reason that it was hearsay. However, the court considered this evidence an exception to the hearsay rule, and, thus, it was admitted. (See Official Statements, Wigmore on Evidence, Vol. 5, Sec. 1630, et seq., page 512).

The reporting officer could obviously ascertain the path the car took by the physical markings upon the highway. He, likewise, could observe the position of the trailer court; the location of the post; the location of the McRae Road; the place where the car came to rest; and the approximate distances of the railroad crossing in relationship to the foregoing. Furthermore, the accident report was filed at 11:59 p. m. on July 21, 1952, by the inspecting officer, or within a half or three-quarter's of an hour after the accident took place, thereby indicating that this officer made an immediate inspection of the scene of the accident.

It is singularly significant that Exhibit No. 8 of the plaintiff is strikingly similar to that of Plaintiff's Exhibit No. 9, to which the defendant did not take any exception. Therefore, assuming for the purposes of argument that Plaintiff's Exhibit No. 8 should be disregarded in its entirety, the admitted facts of the defendant are, that it is some 393 feet west of the railroad track crossing to the point of break in the curve; that the railroad track crossing to the point of break in the curve crest of the highway, which is east of the point of the impact of the car upon the post, stands admitted as being located to the west side of the McRae Road. If the defendant had passed the oncoming car east of the railroad tracks, this distance would have given him good vision and car operation opportunities of which he did not avail himself. This bare fact, by itself, certainly tends to contradict the testimonies of the defendant and his wife. Further, if the defendant did not pass the car after he had first crossed the Alaska Railroad, and while it was on the curve of the highway west of the Alaska Railroad crossing, why would he not pull down McRae Road, which is to his right on the Y and thereby avoid striking of the post? Further, if the defendant did not pass the car going in the same direction after he had first crossed the railroad, it would be logical to assume

that he would not have had to travel at an excessive rate of speed in order to continue in his own lane of traffic, which would have been normal. Therefore, he could have brought his car to an immediate stop, even assuming that he was forced off to the right side of the road and struck the post, by the oncoming car. Further, if the defendant did not pass the car west of the Alaska Railroad crossing at a high rate of speed, and continued at a high rate of speed because of this negligent passing, the three adult people would not have been thrown from the back seat of the car even with the door open. Certainly Mrs. Nance (who was sitting on the left hand side of the car) would have to be thrown violently about in order to be thrown completely out of the car on the right hand side of the car. This could only be accomplished if the car were traveling at an excessive rate of speed.

There was no evidence to indicate that the post was broken off nor that the post was of such a size and kind that would break the car in two or completely stop it. In fact, there was only little damage done to the car by reason of the accident, since the investigating officer, in Plaintiff's Exhibit No. 8, estimated the damages at $120. On the contrary, the evidence is that the car traveled some 120 yards after striking the post (See Plaintiff's Exhibit No. 8); likewise indicating that the car was traveling at an excessive rate of speed.

On re-direct, Mr. Hay testified that the car traveled 200 feet after it went off the road the first time, while defendant Nance refused to estimate.

Two more exhibits shed additional light upon the subject matter. First, Defendant's Exhibit No. A, which is the statement filed by the plaintiff's husband on the 24th day of July, 1952, or three days after the accident. In this statement, it is to be noted that Mr. Hay is extremely indefinite, indecisive and somewhat incoherent. It is to be noted further that the statement was apparently made voluntarily, is not under oath, and is somewhat in conflict with his testimony as to the speed to that which he gave on the witness stand. In this respect, it is to be noted that when Mr. Hay was confronted with the inconsistencies, he stated that he told this fact to one Mr. McGee, who asked for the statement and Mr. McGee advised him that it didn't matter. All he needed was a statement of "some kind", or words to that effect. However, his testimony on the witness stand was corroborated by the plaintiff and it certainly is consistent with the facts deduced from Plaintiff's Exhibits Nos. 7, 8 and 9.

The next exhibit for consideration is that of Plaintiff's Exhibit No. 7, which is a report made by the defendant at or near the time of the accident. It is to be noted that he has designated the car, which he passed, to the west of the Alaska Railroad, and at a point just where the car would bi-sect the McRae Road. He then indicates that he went off the road to the right after making some two swerves. He further makes the following statement: "Passed car and after I got in front, hit shoulder of road and hit ditch and post. Door came open and three girls fell out." This, likewise, is contrary to the testimony of the defendant upon the witness stand; however, Plaintiff's Exhibit No. 7 is corroborated by Plaintiff's Exhibit No. 8, Exhibit No. 9 and the testimony of the plaintiff and the defendant; hence, these taciturnities corroborate the testimony of the plaintiff and her husband and were not explained away by the defendant and the other witnesses. Therefore, while Mr. Hay, husband of the plaintiff, on the 24th day of July, made a statement that he did not know the speed of the car and " * * *, it didn't seem excessive to me, * * * ", the only point of variance to that of his oral testimony under oath is that of the speed of the car; while the defendant, in Plaintiff's Exhibit No. 7, showed that he passed the car west of the railroad tracks, yet he testified at the time of the trial along with his wife, that the

car was passed east of the railroad tracks.

It is logical and a common occurrence to err as to speed but very illogical and very uncommon to err as to location, unless one cannot see, or might have ulterior motives. The place where the car came to rest; the distance and location of where Mrs. Hay, the plaintiff, was picked up after being thrown from the car; the injuries sustained by the plaintiff; the path the car took and the distance it traveled after striking the post; all are physical facts that confirm plaintiff's story and convincingly disprove defendant's stories.

### Law.

The plaintiff was an invitee of defendant.

The defenses pleaded (1) assumption of risk, and (2) contributory negligence.

■■■ At the pre-trial conference, during the opening statement of the defendant and through the trial, the attorney for the defendant referred to three additional defenses other than those pleaded: (a) negligence of plaintiff's husband (b) plaintiff's consumption of liquor, and (c) sudden emergency, which had not previously been raised in the pleadings and to such injection into the case, proper objection was made by counsel for plaintiff. Moreover, proof establishing such defenses was insufficient. Therefore, I find that, even with the ameliorating influence of Rule 15(b), 28 U.S.C.A., the Court is precluded from considering these defenses. For Rule 15 (b) has no application unless issues not raised by the pleadings are tried with the express or implied consent of the parties, Sears, Roebuck & Co. v. Marhenke, 9 Cir., 121 F.2d 598, and where evidence has been admitted over objection and the pleadings have not been amended, no amendment can be implied. Moore's Federal Practice, Vol. 3, Page 848; Rosenberg v. Hano, D.C., 39 F. Supp. 714. And, of course, there must be at least proofs to support the findings if there is no underlying pleading.

Plaintiff obviously assumed the known or normal anticipated risk of the car ride but she certainly did not assume the reckless and wanton negligent acts of driving of the defendant.

Counsel for the plaintiff sums the facts in this respect in his brief, on page 6, and I quote:

"Plaintiff, upon invitation of defendant on the day of the accident, had been a guest in defendant's car on at least two occasions prior to the accident: 1) From the '515' to the Nance home, 2) from the Nance home to the home of the baby-sitter and thence to the 'Fireside Lounge'. There was no evidence as to defendant's driving on these occasions which would put plaintiff on notice, nor was there any evidence to show that the drive from the 'Fireside Lounge' to approximately 300 to 400 feet from the railroad tracks immediately preceding the accident was unusual in any respect that would put plaintiff on notice.

"It would therefore appear that none of the elements which make the doctrine of assumption of risk applicable were present."

■■ First, to the theory under affirmative defense of assumption of risk: The defense of assumption of risk rests upon the plaintiff's consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of harm from a particular risk. Such consent is found when the plaintiff enters voluntarily into a relation or situation involving obvious danger; such implied assumption of risk ordinarily requires knowledge and appreciation of the risk, and a voluntary choice to encounter it. (Prosser, Section 51, page 376).

The plaintiff must first consent to relieve the defendant of an obligation of conduct toward him, and to take his chance of injury from a known risk. The plaintiff, with full knowledge of the risk, voluntarily enters into some relation with the defendant involving danger to himself through defendant's conduct. He makes the choice at his own risk, and is taken to consent that the defendant shall be relieved of responsibility.

By entering freely and voluntarily into any relation or situation which presents obvious danger, the plaintiff may be taken to accept it, and to agree that he will look out for himself, and relieve the defendant of responsibility.

Ordinarily, the plaintiff will not be taken to assume any risk of conditions or activities of which he is ignorant. He must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself.

■ As opposed to contributory negligence, assumption of risk is a matter of knowledge of the danger and intelligent acquiescence in it; while contributory negligence is a matter of some fault or departure from the standard of reasonable conduct.

■ Second, contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to his damage, which falls below the standard to which he is required to conform for his own protection. (Prosser on Torts, Section 52, Page 393).

Restatement of Torts, Section 463: Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, co-operating with the negligence of the defendant in bringing about the plaintiff's harm.

Section 464 makes the standard of conduct the standard to which a reasonable man would conform under like circumstances.

### Conclusion.

■■ I find that the defense of assumption of risk, while pleaded, was not proved by the defendant. I further find that the plaintiff was not contributorily negligent in any manner whatsoever and, therefore, the defendant has failed to establish this defense.

I find the proximate cause of the accident was the negligent and reckless manner in which the defendant endeavored to swing out around and pass a car that was traveling in the same direction as that of the defendant's car, at a place, in the road where there was a curve, and that the defendant, knew or could see the existence of such a dangerous curve. I further find that the defendant knew that an oncoming car was in fact approaching him from the opposite direction with its lights on; that it was in the process of, or had, entered into the completion of the rounding of this curve. I further find that if the defendant had been driving his car in a careful, cautious and reasonable manner at that time, he would not have accelerated and pulled out to pass this car.

### Opinion.

Motion for judgment made at the close of the trial by the defendant, with decision being reserved by the Court, is denied.

■ I am of the opinion that the plaintiff is entitled to recover of and from the defendant the following sums:

| | | | |
|---|---|---|---|
| (a) | Hospital bill | $1627.60 | |
| (b) | Doctor bill | 635.00 | (See Plaintiff's Ex. No. 2) |
| (c) | Nurses bill | 172.00 | |
| (d) | Medication | 50.00 | |
| (e) | Ambulance | 20.00 | |
| (f) | Loss of wages | 3900.00 | (7/21/52–8/21/53) 13 Months |
| (g) | Pain and suffering | 5000.00 | |
| (h) | Attorneys fees | 750.00 | |
| (i) | Surgeon fee (estimated to be the cost of removal of said 14″ pin from her leg) | 100.00 | |
| (j) | Hospital | 50.00 | |